Elizabeth K. FIORE, Plaintiff,

v.

TOWN OF HAMDEN, a municipal corporation, Louis Clini, individually and officially as Finance Director of the Town of Hamden, Lucien DiMeo, individually and as Mayor of the Town of Hamden, Defendants.

Civ. No. N79–186.

United States District Court,
D. Connecticut.

Nov. 15, 1983.

Paul S. Sherbacow, Fleischmann, Sherbacow, McWeeny & Cohn, Hartford, Connecticut, for plaintiff Elizabeth K. Fiore.

Hanon W. Russell, Cantor, Floman, Russell & Johnson, P.C., Orange, Connecticut, for defendant Louis Clini.

William J. Nulsen, New Haven, Connecticut, for defendant Town of Hamden and defendant Lucien DiMeo.

### MEMORANDUM OF DECISION

WINTER, Circuit Judge.*

Elizabeth K. Fiore brought this action against the Town of Hamden, its former mayor Lucien DiMeo, and former Finance Director Louis R. Clini, under 42 U.S.C. § 1983. Ms. Fiore's complaint alleges that the defendants caused her discharge as the Assistant Director of Finance in the Town of Hamden because she was a "whistleblower" who exercised her first amendment rights of freedom of speech. She seeks reinstatement and back pay. Trial was to the court.

The essentials of Ms. Fiore's contentions are as follows. On April 16, 1979, she was informed by Mr. Clini that the proposed budget being submitted to the Hamden Legislative Council would not include funds for her position, and, that if it was approved in that form, she would be out of a job. Plaintiff mobilized her forces with a view to persuading the powers that be in Hamden that the position should not be eliminated. In the course of speaking with several persons in authority and of informing them of the need for a non-partisan civil servant as second in command of the

---

* The Honorable Ralph K. Winter, United States Circuit Judge for the Second Circuit, sitting by

designation.

Department of Finance, Ms. Fiore related to members of the Council certain incidents reflecting poorly upon Mr. Clini. Before her position had been reinstated in the budget by the Council, but after she had been assured by council members in a position to know that the position would be reinstated, Ms. Fiore memorialized the incidents in question in an affidavit given to the Council. This was done at the request of council member Phillip Colwell and with the aid of her attorney.

The affidavit, which is set out fully in the margin,[1] related several incidents. The

1.                    AFFIDAVIT

STATE OF CONNECTICUT
COUNTY OF NEW HAVEN

ss at New Haven, May 29, 1979

I, ELIZABETH FIORE, being first duly sworn depose and say:

1. I am over the age of eighteen (18) years and know and believe in the obligation of an oath.

2. This affidavit is made in response to request from members of the Hamden Legislative Council that I provide further information about the operations of the Finance Department during the past year.

3. On July 12, 1978, I caused a check No. 2439 (American National Bank) to be drawn on a Hamden General Fund Account in the amount of $268,976.12 payable to the City of New Haven for 1975–6 sewer charges. A copy of the check is attached.

4. I gave check 2439 to Louis Clini on July 12, 1978; Mr. Clini was planning to attend a meeting which New Haven Controller Kennedy Mitchell would also appear: I understood that the check would be personally delivered at the meeting. I did not see or hear about the check again until January 9, 1979.

5. On January 9, 1979 Mr. Clini told me that he had not transmitted check 2439. He pulled it out of the top left drawer of his desk and gave it to me. I expressed surprise. Mr. Clini said that Mitchell had not been at the meeting and he (Clini) had forgotten about it.

6. Later on January 9, 1979 I made a Journal entry, No. 79–128, voiding check # 2439. A copy of the relevant page of the Index to the Journal is attached to this Affidavit. After my entry, the Index entry was crossed out. I did not cross it out.

7. In the January 9, 1979 General Ledger Entry No. 79–128 I stated, "Mr. Clini gave this check to Mrs. Fiore January 9, 1979". That is an exact quote to the best of my knowledge and belief. I saw the entry after it was typed and believe that I signed it as is generally my practice.

8. I saw General Ledger Entry No. 79–128 about May 4, 1979 though I am not certain of the date. Mary Brassil, account clerk in charge of revenues, brought it to me on that occasion at my request.

9. General Ledger Entries are kept in a permanent loose-leaf book. No. 79–128 is no longer in the book. There is no entry 79–128 in the book as of May 25, 1979.

10. The Index to the General Ledger contains an entry dated November 3, 1978, noting a voiding of check 2439; it states the voiding occurred January 9, 1979. A copy of this Index and another General Ledger Entry are attached to this Affidavit.

11. I calculate that the money which could have been earned on the $268,976.12 during the almost six months is at least $10,711.88 and probably $12,894.93 if the money had been invested.

12. In the summer and fall of 1978 I prepared an application for the Town of Hamden to the Office of Policy and Management for a small grant to develop a computerized personnel profile system. This was to be a pilot project. The grant contained an amount to pay consultants.

13. I inquired of Reginald DeConti of OPM whether I could be a consultant under the grant. He replied that so far as OPM was concerned I could, if the work I did was in addition to my other duties for the town.

14. On September 22, 1978, I spoke to Louis Clini about working on the project and being paid as a consultant under the grant. Clini said not to be foolish, we should "give it all to a couple of fellows I know up the road. They'll do all the work. You and I will serve as consultants and they will pay us with checks from another company". This is a direct quote to the best of my knowledge and belief.

15. I declined this offer and told Mr. Clini that I would only accept payment by the Town of Hamden and for services rendered.

16. The grant contract has recently been approved. Within the past two weeks I spoke to Mr. Clini again, about it, asking him whether I would be the project director on it. He said "no, I've decided to give it all to the fellows who sold us the computer".

17. On April 16, 1979 Louis Clini told me he had decided to cut my position from the budget. At that meeting, he said to me: "Go quietly and you'll get a good recommendation". He also said that "troublemakers" get a reputation and can't get good jobs, and that he had gone over the situation very carefully and I couldn't fight it.

18. During the same conversation, Mr. Clini told me that Ralph Mauro would take my place. I told him that Ralph couldn't do my job and therefore his replacing me wouldn't be good for the town. Mr. Clini's response was: "I know that but this is the way I want it" (emphasis in his voice).

/s/
ELIZABETH FIORE

Sworn to and subscribed this ____ day of May, 1979.

_____
Notary Public
Commissioner of the
Superior Court

first involved a Hamden Town check, number 2439, drawn on a general fund account in the American National Bank. The check was in the amount of $268,976.12 payable to the City of New Haven for 1975–76 sewer charges. Ms. Fiore's affidavit related that she gave this check to Mr. Clini on July 12, 1978, and heard nothing more about it until January 9, 1979. On that day, Mr. Clini gave the check to her and stated that he had forgotten to deliver it to the New Haven City Controller. Ms. Fiore immediately voided the check and made a relevant entry into the general ledger and its index. Subsequently, the affidavit states, the index entry was crossed out by an unknown person and the general ledger entry taken from the looseleaf book. A new entry, dated November 3, 1978, was made in the index to the general ledger. The entry noted that check 2439 had been voided as of January 9, 1979. Ms. Fiore's affidavit stated that had the amount of the check been invested during the six month period, it would have earned from $10–13,000 in interest.

The second incident related in her affidavit involved a state grant to the town to develop a computerized personnel profile system. The grant contained funds to hire consultants and Ms. Fiore inquired of Mr. Clini whether she might be paid as such a consultant and have the title of Project Director. Mr. Clini responded in essence that both of them might be paid without doing any actual work through under-the-table kickbacks. Ms. Fiore declined to participate in such a scheme.

The third incident described in the affidavit is alleged to have occurred on April 16, 1979, when Mr. Clini told her that the proposed budget eliminated her position. Ms. Fiore said that Mr. Clini told her, "go quietly and you'll get a good recommendation." He further said that troublemakers get a reputation and can't get good jobs. The Council restored funds for Ms. Fiore's position, but, upon learning of the affidavit, Mr. Clini discharged her on June 12, 1979.

The essentials of the defense case are that almost from the beginning of Mr. Clini's tenure as Finance Director he was dissatisfied with Ms. Fiore's job performance, particularly in the area of completing projects in a timely fashion. He testified that he never saw check 2439 until sometime in August when he spotted it on Ms. Fiore's desk. He stated that she informed him that the check had not been funded, and he instructed her not to fund it until further notice from him. He then took the check and held it as leverage to negotiate downward the amount of the sewer charges and to compel the City of New Haven to pay other money owed the Town of Hamden. Before the sewer charges were actually paid, he gave the check to Ms. Fiore to be destroyed. The defendants also contend that the check had in fact not been funded during the relevant period.

The defense presented additional evidence that Ms. Fiore was quite persistent in seeking extra pay for projects to be done in her spare time, notwithstanding her failure to complete her primary responsibilities, and that there had been no offer of any kickback in connection with the state grant. Mr. Clini also testified that he did not fire Ms. Fiore because of the charges she had leveled against him but because the Council had restored her position.

## DISCUSSION

### 1. *The Appropriate Legal Standard*

█ The relevant caselaw holds that the first amendment protection afforded statements by public employees so far as their employment rights are concerned may be limited by the nature of the employee's job responsibilities. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, the expression of views on policy matters made in one's role as a citizen

rather than as a government employee is given substantially greater protection than an attack on fellow employees with whom the speaker is expected to work closely. *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17 (2d Cir.1979). Essentially the cases hold that the degree of legal protection afforded such speech is to be determined only after weighing the nature of the speech's subject matter, the time, manner and place of the speech, and any operational inefficiencies likely to result from it. Whether a different standard applies to the speech in the other contexts, *e.g.* a defamation action, *see New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is not at issue.

In the present case Ms. Fiore's affidavit addressed issues of importance to the Hamden Legislative Council and the citizens of the town. The disclosure of inefficiency in the handling of public funds and conduct bordering on, if not crossing into, corruption clearly falls within the class of communications near the core of the first amendment. The "go quietly" incident, however, is of considerably less public importance, particularly since Ms. Fiore herself testified that it was intended only as advice against making a fuss rather than as a warning against charging Clini with incompetence or dishonesty. Still, such conduct may demonstrate something about Mr. Clini's performance as a bureaucrat and might be marginally relevant to the Legislative Council.

Plaintiff argues that the first amendment requires that she be protected in her employment absent a showing that her affidavit was knowingly false. While there is evidence in the record which would justify submitting the issue of knowing falsity to a trier of fact, I do not reach it since it is clear that her speech was not entitled to such broad protection. At best, first amendment protection is available only if the statements in her affidavit were reasonable in light of the objective evidence available to her as Assistant Director of Finance. To the extent that she, given her position, knew or should have known that they were either doubtful or not true, the statements are not protected and her discharge was lawful. Indeed, it may be that the first amendment provides even less protection but I need not determine that in light of my findings of fact *infra*.

I believe this to be the maximum legal protection to which Ms. Fiore's affidavit is entitled for two reasons. First, Ms. Fiore was second in command of the Department of Finance, and the efficiency of the Department would obviously be diminished if she was not on workably correct terms with the Director. Such a working relationship cannot be maintained if the Assistant Director may level charges of inefficiency and corruption against his or her superior without a reasonable factual basis, and the Director cannot act to remove the Assistant or otherwise prevent a recurrence. The mutual confidence necessary to operational efficiency cannot exist in such an adversary atmosphere. If anything, the argument that such speech is protected only if actually true rather than just reasonable is more persuasive than plaintiff's contention. Second, Ms. Fiore's affidavit was of significance to the Legislative Council and the citizens of Hamden because of her special position. She was not speaking as a member of the general public but as a financial specialist with access to the facts. The Council and public had a right to expect that her charges against Mr. Clini were based on a combination of her skills and a diligent investigation. To the extent the statements were not reasonable in light of the facts available to her, they were not only of no value to the Council or the public but were actually misleading. Such statements are not legally protected speech.

### 2. *Findings and Conclusions*

A number of factual issues can be disposed of initially. Mr. Clini became Director of Finance in July, 1978, and his relations with Ms. Fiore thereafter ranged from cool to hostile. Ms. Fiore had sought the position of Finance Director and was recommended for the position by a committee of the Legislative Council of Hamden. Nevertheless, the appointment is made by

the Mayor, who named Mr. Clini, even though he, unlike other candidates, had not been interviewed by the Council committee. By August, Mr. Clini had begun a campaign to narrow Ms. Fiore's responsibility and ultimately to eliminate her from the Department of Finance. Notwithstanding her testimony to the contrary, Ms. Fiore was well aware of Mr. Clini's coolness toward her. Each of them utilized the memorandum as a method of "papering" the record against an uncertain future. Mr. Clini sent out memoranda indicating his dissatisfaction with the untimely performance of Ms. Fiore's responsibilities and she responded with memoranda indicating that her lack of authority was causing many of the problems in the office.

Defendants contend that the reason for plaintiff's discharge was not her conversations with members of the Legislative Council and subsequent affidavit but the fact that the Council restored her position. While I find it to be the case that Mr. Clini had determined as early as August, 1978, to be rid of Ms. Fiore if at all possible and that the proposal to eliminate her position was a thinly disguised maneuver to evade civil service regulations, I find it difficult to credit his testimony that he fired her on June 12, 1979, solely because the Legislative Council had restored her position. While he may sincerely believe that today, the circumstances would have appeared differently in June, 1979. Had the restoration of Ms. Fiore's position taken place in the absence of her sworn charges against him, I think Mr. Clini would have had second thoughts about summarily dismissing an employee who had just won such a political fight and had civil service remedies available. Rather, the charges leveled by Ms. Fiore as to the check and kickback scheme, but not the "leave quietly" incident, were both the last straw and a golden opportunity for Mr. Clini. These charges made it virtually impossible for him to continue as Finance Director with Ms. Fiore as his immediate subordinate, and inaccuracies in the affidavit provided a cause for discharge which might not otherwise have existed. I find, therefore, that Ms. Fiore's discharge was the result of her allegations to the Legislative Council concerning check 2439 and the kickback proposal.

I discount the "leave quietly" incident as a cause of discharge because, while not a paradigm of proper bureaucratic conduct, it pales in significance to the other charges and did not contribute to her firing.

I turn now to the issue of the reasonableness of Ms. Fiore's allegations against Mr. Clini. As to the incident of the check to the City of New Haven, the record thoroughly undermines her version of events. Ms. Fiore's affidavit states that the check was issued and given to Mr. Clini on July 12, 1978. In fact, it is conceded that Mr. Clini did not become Finance Director until July 17, 1978. This is a major inaccuracy, for it indicates that the authority for issuing and funding the check did not come from Mr. Clini and that Ms. Fiore had the check in her possession for at least some period of time after issuance and before turning it over to Mr. Clini. It also indicates a lack of concern for factual accuracy in preparing the affidavit.

I further find that at the time she signed her affidavit Ms. Fiore knew or should have known that the check was not funded after August 9, 1978. The Department's cash flow records of the American National account demonstrate that check 2439 was not funded after August 9, 1978 through December 31, 1978. In fact, the account in question showed negative balances and overdrafts on several occasions throughout the period. Whether the check was funded after December 31, 1978 until its voiding nine days later is not clear but is of no significance.

Ms. Fiore testified that she had daily access to these records. Indeed, her handwriting appears on them. The cash flow sheet for August, 1978, has a notation in the left-hand column in Ms. Fiore's handwriting under August 9 that the check to the City of New Haven for $268,976.12 had not cleared. This notation is in handwriting which differs from most of the notations on the several sheets which make up the exhibit and appears to be somewhat unusual in that it mentions a particular

check. No specific check is noted again under January 9, 1979, when the amount of the check is deducted next to a note written by Ms. Fiore that she had received it from Clini.

Indeed, the balance in the American National account was much less than the cash flow sheets indicated since, on August 10, the day after Ms. Fiore noted that check 2439 had not cleared, a wire transfer of over $120,000 out of the account was executed but not recorded on the cash flow sheets. I find that Ms. Fiore executed this wire transfer.

The evidence thus supports the defendants' version of events. Immediately after Ms. Fiore noted on August 9 that check 2439 had not cleared, the American National account never again, except possibly for the brief period in January, had sufficient funds to cover the check. This is squarely consistent with Mr. Clini's testimony that he first saw the check in August and immediately instructed Ms. Fiore not to fund it. It is inconsistent with her testimony that she was instructed in July to fund the check and that it was in fact funded until January 9, 1979.

Other documents also support the defendants' version. Although cash flow statements were kept for the American National account on a timely basis, bank reconciliation analyses were not done by the Department of Finance until long after the fact. Thus, the bank reconciliation statement for October, 1978, was not prepared until April, 1979. That reconciliation statement reflects a positive balance of $74,-264.78 in the American National account. That positive balance was arrived at, however, only because of Ms. Fiore's handwritten instructions at the bottom of the page, dated April 23, 1979, directing Ralph Mauro, a CETA employee in the Department of Finance, to make certain adjustments. These included crediting the account as of November 1, 1978 with the sum of $268,-976.12 by voiding check 2439 to the City of New Haven. The handwritten entries further instruct Mr. Mauro to make certain debits.

The significance of the October reconciliation statement is twofold. First, it is indisputable evidence that the changes in the general ledger described in paragraphs 6 through 10 of Ms. Fiore's affidavit were made pursuant to instructions she herself gave on April 23, 1979. To the extent the affidavit implies that someone changed records after the fact to foreshorten the period in which check 2439 was outstanding, and thereby to reduce the amount of lost interest, Ms. Fiore knew, or should have known, that such an implication was false.

Second, because the October positive balance in the account was arrived at only by her crediting check 2439 to that month, Ms. Fiore knew at the time of her instructions to Mauro that the check was not funded as of October 30, 1978, and that the possible loss of interest was less, perhaps a great deal less, than suggested by her affidavit.

The timing of, and reason for, her instructions to Mauro underscore the fact that she had knowledge of facts at a critical time inconsistent with her affidavit. These instructions, in her handwriting, were written on April 23, 1979. By that date she had been informed that her job might be eliminated, had retained counsel and was busy mobilizing her forces to influence the Legislative Council. Letters to the editor from a friend had appeared in the local paper as had a newspaper story quoting her as charging the Town with sex and age discrimination. The April 23 instructions were written at or near the time, moreover, when she began to relate to members of the Legislative Council the charges she made five weeks later in her affidavit.

Ms. Fiore had good reason at the time to focus upon the lack of funds in the American National account and to alter the records so as to indicate that check 2439 had been voided on November 1, 1978 rather than the actual date of January 9, 1979. Had the check not been credited to that account as of November 1, 1978, rather than January 9, 1979, the reconciliation statement would have shown almost a $200,000 negative balance. One important

reason for this large negative balance was the debit resulting from the wire transfer by Ms. Fiore of more than $120,000 out of the account on August 10, 1978. This debit was included in the October, 1978 reconciliation statement, prepared in April, 1979, because the wire transfer had never been recorded in either the ledger or upon the cash flow sheets. Ms. Fiore had reason to fear that such an imbalance, caused in part by her own unrecorded wire transfer; and coming to light at a critical moment in her campaign to save her job, would not help her persuade the Council of the need for her position to protect the public fisc. To eliminate that imbalance, she directed that the records be changed. While there is nothing improper in reconstructing the financial records in this way, her actions at the time clearly establish her knowledge five weeks before she signed the affidavit that check 2439 was not funded as of October 31, 1978. A quick review of the cash flow sheets at this time would have disclosed that it had not been funded since August 9.

Contemporaneous documents to which Ms. Fiore had access, as shown by her testimony and handwritten notations, thus fatally undermine her allegations as to check 2439. I find as a fact that when she signed the affidavit she either knew or should have known that (i) Mr. Clini had instructed her not to fund check 2439 when he first learned of it in early August, 1978, and (ii) the check was not in fact funded after August 9, through December 31, 1978.

No such compelling documentary evidence exists concerning the allegations of a proposed kickback, but it is difficult to credit one part of a story when the remainder has been so thoroughly undermined. Part of her original account of the affair, moreover, borders on the bizarre. Paragraph 16 of the affidavit states that in the middle of May, 1979, at the very time Mr. Clini was openly trying to eliminate her position and she was telling her tale of the kickback offer to members of the Legislative Council, Ms. Fiore went to Clini and again asked whether she could be project director on the grant. No ready explanation for this proposal was given by plaintiff at trial. In any event, I find that Mr. Clini had resolved to rid himself of Ms. Fiore at least as early as August, 1978, and that it is implausible that he would suggest to her somewhat later that she join him in what might be a criminal, and certainly was an improper, scheme. Such conduct is not consistent with the record. Finally, her failure to report this event to the Mayor at the time weighs against her version. Whether Ms. Fiore negligently misunderstood a remark by Mr. Clini, imagined the conversation or fabricated it, I need not and do not reach.

So far as the advice that she should go quietly is concerned, I find as a fact that disclosure of that conversation did not contribute to her discharge and, therefore, I need not find whether it in fact occurred.

Since Ms. Fiore knew or should have known when she signed the affidavit that the allegations which ultimately caused her discharge were untrue, that discharge was not in violation of her first amendment rights.

This opinion shall serve as my findings and conclusions under Rule 52, FED.R. CIV.P. Judgment should be entered for all defendants.

SO ORDERED.